Next we have the United States v. DeBorba. Good morning. My name is Rebecca Fish and I represent João de Borba, the appellant in this case. I would like to reserve three minutes for rebuttal. I understand that the Court does not want to hear argument on the 922g5 disarmament of many non-citizens issue, but I am happy to answer any questions the Court has. As to the remaining issues, the Court should reverse Mr. de Borba's conviction for possession of an unregistered silencer because no historic tradition of regulation supports the statute of conviction. The Court should reverse Mr. de Borba's convictions under 922g8 because the facts of his case differ in ways that matter from Rahimi and Van Dyck, each of which were decided as applied. Finally, the Court should reverse the false statement-related convictions because the government did not prove that the statements at issue were material. On the facial challenge, you have a heavy burden to bear. So if it's constitutional in some of its applications, how can you succeed on your facial challenge? Are you speaking as to the silencer? Yes. Yes, Your Honor. I don't believe that the NFA's restriction on silencer is constitutional in any application. I agree that we did present a facial challenge here. And specifically focusing on the Second Amendment challenge, I would note that the parties agree that the Second Amendment protects silencers. So the only remaining issue is whether a historic tradition of regulation justifies the restriction here. Well, let's just stop there because simply because the parties might agree and the government might have changed its position over time doesn't mean that that's what the Court would decide. Certainly, Your Honor. My question to you on that is, I think when the case first started out, perhaps there wasn't the benefit of the Duncan v. Bonta case where it suggests that a silencer would be an accoutrement and not an arm. What is your response to that? Your Honor, I believe that sentence in Duncan is not reason dicta. Duncan finds that extended magazines are accoutrements, not accessories necessary to the ordinary use. And in a list of accoutrements, cite silencers. But it gives no meaningful reasoning for that sentence. So I don't believe that controls this Court. I would note— Ruling that accoutrements are not protected, it does control us, correct? Correct. So you'd have to persuade us that a silencer is not an accoutrement. Is that right? Precisely, Your Honor. And the rule emerging from Duncan—or I shouldn't say emerging from—articulated clearly in Duncan is that, while are protected, are accessories and components necessary for the ordinary usage of a firearm. So your position is that a silencer, although there's some language dispute about whether you should not call it a silencer because it doesn't completely silence the shot, your position is that is essential to the arm? Yes, Your Honor. And how can that be? What is your best position or best citation for that? Your Honor, explaining kind of what is necessary for the ordinary usage, there are several citations by both the parties that ordinary usage includes essentially possessing, carrying, storing, practicing using in a safe manner, and self-defense with a firearm. In Duncan, the court found that extended magazines were not necessary for ordinary usage because they were not necessary for those activities. I don't believe that definition is limited to the mere mechanical firing of a firearm because that would limit components and accessories to essentially a bullet, gunpowder, and some sort of flint, which obviously triggers, receivers, barrels must be included because they're necessary for those ordinary activities. Here, a silencer is necessary for those ordinary activities to be done safely. As detailed in our briefing, it reduces the report, essentially the sound that a gun produces when fired, when produced, when fired. That goes down to, you know, it might be interesting, it might be helpful, but is it necessary? And it seems to me that that's where kind of the rubber meets the road here for your case. Certainly, Your Honor. And if I may use an analogy, I would compare a silencer more to a safety than to an extended magazine or tactical scope. A safety is something that is built into many firearms, but some firearms are built without safeties, and people can purchase accessories like a trigger safety or trigger lock that function as a safety on their firearm. A safety makes it substantially safer for a person to store, carry, practice with, or use a firearm when needed in self-defense. And if the government were to restrict a person's ability to obtain a safety, that would significantly deter that person from exercising their right to armed self-defense because they would have to trade their constitutional right for their safety. So to hear, silencers make all of those activities of ordinary usage safer by reducing the hearing damage to the user, as cited in my briefing. Here, the item in question, as tested by the ATF, reduced the report of the firearm by 10 decibels from a level that would damage a person's hearing to a level that was close to that which would not. That is the primary function of a safety. It's not to silence or conceal. It is to, essentially, it functions to limit hearing damage. So I believe a silencer is closer to that of a safety in terms of how it functions with a firearm. By contrast, something like an extended magazine or a scope that enhances, perhaps, the effectiveness or ability to aim of a firearm are not necessary for this ordinary usage of possessing, storing, carrying, practicing, and firing in self-defense. So I would ask this Court to conclude that silencers are accessories or components necessary to the ordinary usage of a firearm, much like a safety would be, but unlike an extended magazine. And if, but if we didn't need to go that far, we could go the route of the Fifth Circuit and just assume.  Correct, Your Honor. So I would appreciate if you could then address the Fifth Circuit Peterson ruling and why, in your view, we should create a circuit split. Your Honor, I think there's a couple of reasons. Peterson did, indeed, assume without deciding that silencers were firearms protected or were accessories protected by the Second Amendment. But Peterson relied largely on a kind of a legal presumption that the Fifth Circuit has read into the Supreme Court's case law, that in Heller and Bruin, the kind of notes that those decisions did not disturb presumptive shall issue licensing schemes. It's a famous footnote nine that everybody keeps referring to, right? That those kind of presumed that some sort of registration scheme was lawful as long as it was a shall issue scheme. And Peterson noted that the litigant, Mr. Peterson, did apparently a poor job of preserving the issue before the Fifth Circuit and did not, was not clear on which argument he was presenting. And Peterson, at page 654, noted that we do not foreclose the possibility that another litigant may successfully challenge the NFA's requirements. So I think this Court is not so much creating a circuit split as just dealing with a case where the issue is better preserved than in Peterson. Additionally, this Circuit has not adopted the same view of that presumptively lawful shall issue scheme that the Fifth Circuit has from that language in Supreme Court statutes. In both Duncan and more recently in Rode v. Bonta, this Court did not kind of hold the defendant to a burden of disproving a presumptively lawful scheme, but rather applied Bruin faithfully and said— But we didn't not do it either, right? We didn't, like, suggest that there is no shall issue requirement. You're just saying that we decided it differently in those cases. Correct, Your Honor. And so in both of those cases, in Duncan, the Court held extended magazines were not in reason dicta, so that would influence this Court, went on to still do the historical analysis required by Bruin at Step 2. In Rode, there was seemingly no meaningful dispute that regular ammunition was covered by the Second Amendment, so the Court engaged in Bruin Step 2 without any kind of presumption that a shall issue scheme is lawful absent the defendant proving otherwise. Those cases kind of coalesced around a couple of regulatory traditions. Specifically, Duncan relied—or found a regulatory tradition of restricting especially dangerous uses of weapons once they had been put to criminal misuse. It relied on some of the regulations that the government cited here to support the NFA's restrictions on firearms. And in Duncan, this Court found that that was sufficient for California to ban extended magazines because those were, you know, used in mass shootings and had especially dangerous use. And essentially, the Court reasoned that the item in question was the ammunition, and extended magazine was an especially dangerous use of that ammunition. Here that is not the case. And in Rode v. Bonta, the Court emphasized that Bruin did not say that all shall issue schemes are entitled to a presumption. Well, that decision has been vacated. Rode. Yes. Yes. So it's kind of hard for us to argue about it. At this point, it's actually been vacated. But I would note just in the differences that Duncan really focuses on the dangerous uses of weapons that were put to criminal misuse. And here the NFA does not limit itself to dangerous uses of silencers. It prohibits, it significantly impedes the use of silencers in basically any application. And that is so because it does include both a taxation that was designed to be prohibitive and punitive. And as noted in our briefing, the evidence of actually punitive taxation schemes is pretty limited to about three states or three colonies. Historically, that is similar to that which the Supreme Court rejected in Bruin as sufficient to justify concealed carry regulations. And it is enforced with very punitive criminal penalties for noncompliance as opposed to mere forfeiture or a fine for noncompliance. All of those factors, I believe, demonstrate that the government has not met its burden under Bruin Step 2 to justify the NFA's restrictions on silencers. Turning to the 922G8 convictions, essentially both Rahimi and Van Dyck were decided as applied as as applied challenges and were limited to the facts of those cases. Certainly their reasoning is informative, but neither said that the statutes and its two prongs are constitutional in all of its applications. And here, the facts of this case differ in ways that matter from the facts of those cases. I will focus on Van Dyck because Rahimi was addressed further in our briefing. Van Dyck came out later. But Van Dyck, essentially this court made a factual finding. So rather than holding the court thought about applying the Duarte rule that the legislature, consistent with historic regulations, could disarm a group of people that it viewed as dangerous, but didn't actually apply that in Van Dyck precisely for two reasons. One, the court made a factual finding that the state court in Van Dyck had actually made an individualized determination of dangerous based on the facts known to it at the time and based on an Idaho law in the Idaho Supreme Court's interpretation of the statute that said courts must issue protection orders in order to protect victims of domestic violence. This court relied on that to draw the inference that, in fact, an individualized determination of dangerous of Mr. Van Dyck had been made. Second, the court declined to find that 922G82 was supported under Duarte's kind of legislative finding of dangerousness of a group because it said we don't need to reach that. Mr. Van Dyck at the time was subject to a felony indictment and, as such, was subject to a different ground of disarmament. But we have forms here that basically, check, check, the finding of dangerousness is made, correct? In one count, yes. In one count, no. So the protection orders underlying count two contain a kind of form check finding. The protection orders underlying count one contain no such finding. They simply satisfy the second prong of 922G8 that they restrain the person from contacting, et cetera, another person. What differs here, among other things, from Van Dyck is the Washington law background. As cited in our opening brief, the relevant Washington law for protection orders pretrial states that courts may issue protection orders to protect victims of domestic violence and the post-conviction law states essentially that courts may issue protection orders but does not contain mandatory language. It's not mandatory and the court chose to impose one after a conviction on domestic violence charges. Why doesn't that imply a finding of dangerousness? Well, one other factor that I think is relevant here, Your Honor, is the purpose of the Washington state law. The preface to that chapter states that the law is really focused on making sure law enforcement and prosecutors enforce existing laws rather than telling judges what findings they should make. So a court may find it appropriate to have a no-contact order to prevent witness tampering, to prevent a victim in a domestic violence case from recanting or changing their story, to simply diffuse a situation without necessarily finding that the individual poses a credible threat to another person. So I do believe that difference in the facts in this case versus Van Dyck indicate a different result here. This is because Rahimi and in turn Van Dyck relied so heavily on the fact that surety laws and the going-armed laws depended on an individualized prior finding of dangerousness. And I don't think that the same inference can be drawn from the facts here that was made. Finally, turning to the false statement counts. Essentially, Mr. DeBorba was convicted of, under two different statutes, one, 922A6, which prohibits false statement in the purchase of a firearm, and another, Section 911, which prohibits a false claim to U.S. citizenship. Each of those statutes has a specific materiality element, and the Supreme Court in Abramski made clear that that element for 922A6 is whether the sale could have proceeded had the true information been shared. We aren't, of course, going to discuss the 922G5, but if your challenge there failed, can your materiality challenges still prevail and succeed? No, Your Honor. They rise and fall together? Correct, Your Honor. All right. And I would note that many of the, you know, we discuss in briefing why the cases relied upon by the government are not controlling here. Those cases pertain to other elements of the broad general federal false statement statute 1001, which, for example, you know, one of those cases essentially said that even though the statute that caused the government to ask a question about a person's political affiliation was later struck down on First Amendment issues, the question was still within the jurisdiction of the United States, which is the jurisdictional rather than materiality element of that statute. I would note that more recently this Court in United States v. De France, albeit in a footnote, noted that there where the Court decided that Mr. De France's domestic violence misdemeanor convictions were not actually a categorical match for that prong of Section 922G, that the conclusion that De France's conviction under Section 452, et cetera, of the state code does not qualify as a misdemeanor crime of domestic violence may call into question his convictions under Section 922A6. The issue is not presented there, but this Court has been open that if basically a lie on a gun purchase form could not have prevented the sale, that lie would be immaterial. In Abramski, even though the true purchaser was an eligible possessor, the Court relied on the fact that 922 also requires in-person purchase. And I see I'm going into my rebuttal time. Just before one question, and I'll make sure you get your two minutes on rebuttal, whether I just want to confirm for your vagueness challenge on the definition of silencer, that's a facial challenge, is that correct? Correct, Your Honor. May it please the Court, William Glasser for the United States. Starting with the NFA's restriction on possession of unregistered silencers, the parties have come to some agreement, as noted after our supplemental briefing, with regard to whether the Second Amendment analysis ought to apply to the possession of silencers. I understand Judge McEwen's concern about the Court's en banc decision in Duncan, and I think it's fair to say that Duncan indicates that non-essential components of weapons are not protected by the Second Amendment. The United States does not agree with that position, but to the extent this Court finds that silencers are non-essential firearm components, that would likely control. Would you argue that silencers are essential, or you just disagree with the actual legal holding of Duncan? We disagree with the legal holding, Your Honor. We do not think that silencers are essential to the use of weapons. We think, and again, I don't want to fight too hard on something that would give us the win, but just to be clear about the government's position here. Of course, we can't really rely on an agreement between the parties as to the meaning of this. There was dispute between the parties before, right? That's correct, Your Honor. And now the government has altered its position, so I understand that. That's correct, Your Honor. And now, on that point, you're in agreement with the defense. That's correct. Just to briefly explain the government's position and then explain our preferred approach, we recognize you might disagree with us on that preferred approach. To briefly explain the government's position, our view is that courts should not be drawing lines between necessary components of firearms or necessary accessories of firearms and those which are merely useful, because we do not think that the Second Amendment protects only the least useful configuration of a weapon. So you can imagine all kinds of firearm accessories that are very useful to the safety and the functioning of the firearm. Opposing counsel referenced a safety, actual firearm safety. I'm sorry, Counsel, but as a three-judge panel, we're bound by Duncan, right? So we can't actually agree with your argument here, rule on that basis. So assuming that we are drawing that line, you are not arguing that silencers are necessary and essential? That's correct, Your Honor. We do not think, we think that if this court... We were to reverse somehow, Duncan, then we could consider your argument. That's correct. But, Your Honor, to be clear, I think this court, while bound by Duncan, can still resolve this case in a way that doesn't simply say silencers completely fall outside the Second Amendment's protections, because Duncan didn't actually address silencers specifically. And this court could do, as Your Honor mentioned, do what the Fifth Circuit did in Peterson and say that, let's assume we're controlled by Duncan, let's assume that, let's assume that, pardon me, not that we're controlled by Duncan, but let's assume that we don't have to extend Duncan to this situation and they are protected. But we would have to find that silencers are essential. Like, we'd have to apply Duncan to silencers, right? And then find silencers are essential. But you're not arguing that. I thought you were. I thought you were arguing that they are necessary. Not that they're necessary, Your Honor, to the functioning of a firearm. No, but that they're useful. And so we think the Second Amendment analysis should apply. So it's not necessary, but it's useful. Exactly, Your Honor. So if this court believes... Would it be useful, for example, to have certain kind of paint on a firearm because it might provide camouflage in a certain situation? Would that... It wouldn't be necessary, but would that be useful? Your Honor, I think it very well may be. And again, we don't think recognizing this court is bound by Duncan. No, but I'm just trying to understand what useful means. Sure. Your Honor, we don't think that... We think that the appropriate analysis is that anything that applies to a firearm or a firearm accessory falls within the sort of Second Amendment analysis. Not that restrictions on those things are unconstitutional. We're certainly defending the NFA's registration and taxation requirement on silencers, but we're just saying that the court ought to do a Second Amendment analysis and not simply say, oh, that falls outside the Second Amendment because of line drawing problems. Now, again, recognizing this court is bound by Duncan, the Supreme Court, I would note, is considering the cert petition in Duncan this Friday. So perhaps if the Supreme Court were to grant certiorari in Duncan, you know, that would certainly shed some light on this case. But the right approach, we think, is essentially the approach taken by the Fifth Circuit and Peterson, which is to say, let's assume that the Second Amendment applies to and protects silencers as firearm accessories. The NFA is still constitutional as applied to silencers because the modest burden imposed does not conflict with the Second Amendment. And it's consistent with historical restrictions on the possession of certain firearms, particularly those firearms that, like silencers, or those firearm accessories, like silencers, those types of weapons, that have the potential to be used for criminal purposes beyond sort of the ordinary use of firearms. So all firearms can be used for criminal purposes. No dispute on that. But certain weapons are more susceptible to criminal misuse. As we explained in our supplemental brief, silencers do make firearm reports harder to detect. And therefore, they, although the vast majority of uses are legal, there is a heightened concern about improper and illegal uses of silencers. And there is a history and tradition in this country of regulating firearms that are not just dangerous and unusual, but also those that can be used for unlawful purposes, such as bowie knives. To be clear, it's not the United States' position that silencers are themselves dangerous and unusual weapons that can completely be banned. But we do think that the dangerous and unusual weapon analysis is helpful in the sense that if dangerous and unusual weapons, those that aren't in common use for lawful purposes, can be banned entirely, weapons or even accessories like silencers that at least present some heightened concern about unlawful use can at least be subject to a modest taxation and registration requirement, such as the National Firearms Act. And that's consistent, again, with the Fifth Circuit's decision in Peterson. And we would ask this Court not to create a circuit split with the Fifth Circuit, but to simply say that even assuming that Duncan extends to silencers, the National Firearms Act is not unconstitutional as applied to silencers. Can you address the argument that the criminal penalties and the high rate of the tax cause this to be essentially a ban? Your Honor, it's certainly not a ban today. There are millions of lawfully registered silencers on the national firearm record. That number is going up dramatically just because ATF has expedited the processing and as silencers have become more popular among sportsmen. I will also note that as of January 1st, so a month from now, that tax is going to go to zero. So certainly going forward, it's not going to be prohibitive. But even now, a $200 tax on a silencer is not prohibitive. That tax is not significantly higher than the fees that are charged, for example, for a concealed carry permit in various jurisdictions. So although perhaps at the time that the National Firearms Act was passed in 1934, it was prohibitive, effectively prohibitive, inflation has changed things. And just as this court can consider inflation, for example, in the context of the excessive fines clause, it can also consider inflation in determining whether or not the burden imposed by the National Firearms Act is an unconstitutionally high burden. Again, referring to Bruin footnote 9, there the court said that perhaps, I think it said exorbitant fees might be unconstitutional and this is not an exorbitant taxation requirement. But you could end up with a custodial penalty, correct? I'm sorry, Your Honor. I mean, that you end up with a criminal violation that can net you a custodial penalty. Sure. And you didn't have that in the historical regime of the $200 fee of the past. Your Honor, ever since... But I don't know if you had custodial. That's my question.  So and I hope I'm understanding the question correctly, Your Honor. So ever since the National Firearms Act was passed in 1934, there has been this sort of backup of a criminal penalty. So you can go to jail if you don't register your silencer. Right. But before that, we didn't have custodial penalties as a historical tradition or did we? So, Your Honor, traditionally the penalties for the failure to pay a tax, for example, on Bowie knives was traditionally a fine. Similarly, for possessing these sort of weapons where possession or carry was prohibited were also fines and not a custodial sentence. But I don't think that the penalty is the important or certainly not the most important consideration under Bruin. When we're looking at how and why it burdens the use, the penalty, the historical penalty doesn't have to line up exactly. I mean, so in the felon possession context, you know, we have historical penalty of death doesn't line up perfectly with punishable by more than a year in prison. And yet this court in Duarte concluded that the historical penalty could support the modern day penalty. And that's a case where the penalty was much lighter. Sure. Do you have a case where the penalty was greater and we've said it's good enough? Uh, Your Honor, I mean, I think, uh, I think the 922 G8 context, um, kind of sort of getting to the next point is one, uh, is one example. So historically, uh, the violation of the surety laws, um, was, you know, there, I guess it depends on how you look at it. The person could be restrained, but they weren't necessarily deprived of their firearms. I'm not sure I have a perfect example of that, although it might just be a lack of memory on my part. I wanted to just make sure I understood your position on footnote nine, if you could elaborate.  Um, so our, our view of footnote nine of, of Bruin is that footnote nine says that certain restrictions on the public carry of firearms, such as shall issue licensing schemes, background checks, training requirements are sort of presumptively constitutional as long as they don't have, uh, excessively long wait times or require exorbitant fees. And we think that the NFA's registration and taxation requirement for silencers is exactly that sort of regime. So it would meet that presumption and that presumption wouldn't be undone by the details of the scheme. That's correct, Your Honor. Again, I don't think the court necessarily needs to rely on some sort of presumption. I think you can apply Bruin's how and why analysis and reach the same conclusion. If I may then turn to the 922 G8 challenge, the, the, Mr. DeBorba seeks to, uh, find daylight between his case and Rahimi and Van Dyck based on the fact that there were slightly different facts in those cases. With respect to the charge in count two, which was premised on the actual finding, uh, that he posed a credible threat, that, that challenge is simply foreclosed by Rahimi. Rahimi did not say it was limiting itself to only people who have, you know, engaged in a particular kind of violence. Rahimi said that where the court has found a credible threat presented by the defendant, that is enough. It doesn't have to be a specific type of violence such as firearm violence. That would make no sense to say that someone who threatened his domestic partner with a knife, uh, could not constitutionally be deprived of a firearm. And it's simply not what the Supreme Court said in Rahimi. With respect to count one, in the government's view, count one here, which was premised on two protection orders, neither of which included a credible threat, uh, assessment, but both, uh, satisfied 922 G8, uh, G8C2. In the government's view, that is, uh, that, uh, that count is, can, can satisfy both C1 and C2. It can satisfy C1 because those orders were imposed subsequent to the initial credible threat finding. But we also think that under Van Dyck, it satisfies, certainly satisfies C2 and C2 is because the court in, uh, the courts in both of those, uh, in both entering both of those protection orders entered them and specifically prohibited from him from using violence against his intimate partner and family members. And again, all that Mr. DeBorba can do is say, well, the facts in this case are a little bit different than in Van Dyck. But in Van Dyck, the, uh, the Idaho scheme said that you, in order to protect people, you, from domestic violence, you should enter an order prohibiting them from, uh, engaging in violence. And that's effectively what the Washington regime does as well. As, uh, DeBorba's counsel noted, the Washington, uh, regime doesn't require the imposition of a protective order. It's discretionary. And if you, if you sort of look at the complicated procedural history here, the orders that underline count, uh, underlie count one followed on the initial charges in which the credible threat assessment was made. Uh, paragraph 59 of the PSR explains that the initial charges in which the credible threat finding was made were later dismissed and reincorporated in a subsequent state case. And that subsequent state case was one of the, one of, uh, one of those, uh, was the, was one of the orders underlying count one. It's a little bit complicated, but I think if you look at the, at the, the factual history here, you, you see that, uh, the orders underlying count one satisfy both G8C1 and G8C2. If I may then, uh, briefly touch on the issue of materiality, the, the Supreme Court in Abramski said that, uh, a statement is material if the sale could not have proceeded under the law, if a truthful statement had been made. The materiality claim that Mr. DeBorba is raising hinges entirely on his G5 and G8 claims. But even, even if he were to prevail on both of those claims, which we don't think he can, uh, he would still not have a constitutional right to lie on the federal firearms purchase forms. We have cited a number of Supreme Court cases, and I think this court's recent decision in Manny simply foreclosed the argument that it is not material, uh, it's not a material misstatement if for some reason it turns out later that the requirement of a truthful answer is part of an unconstitutional regime. So the Supreme Court has considered it, uh, in the context of lying about your communist party membership, uh, under the first amendment. So that was the, uh, the Dennis and Bryson cases. Uh, and the Supreme Court said, look, even if it turns out that that violates the first amendment, you can't lie about the fact that you're a communist party member. I think the same analysis applies here. Even if it turns out that you cannot be prohibited from possessing a firearm because you're an unlawfully present alien or because you are subject to a domestic violence restraining order, you cannot lie about the fact that you're disqualified under law, under statutory law from, from purchasing a firearm. So those, that claim is also foreclosed by Supreme Court precedent and this court's precedent. If the court has no further questions, we're happy to rest on the briefs and ask the court to affirm. Thank you. You can give her two minutes for rebuttal, please. Thank you, Your Honor. I'll reply briefly, um, first in addressing the court's question about the differences and the how of the NFA's restriction on silencers versus the historic regulations. The court is correct that those historic regulations, um, violation of the taxation and registration requirements was punished only by fine or on occasion, I think forfeiture of the gun or gunpowder in question. Um, the Supreme Court has squarely addressed this question. In Bruin, the, at page 57, the court held that historic regulations providing for fines or bonds as penalties were not relevantly similar to the concealed carry law that could be punished by imprisonment or jail time. In Heller at, um, 633 to 34, the court held that historic regulations that punish violations and I quote, with a small fine and forfeiture of the weapon, not with significant criminal penalties, end quote, were not equivalent to a modern law punishing violation with jail or prison time. On that basis, I believe it is clear, um, from the Supreme Court that contrary to Duarte, where the forfeiture or disarmament is a lesser penalty than the historic regulations, when it is a far greater penalty, that difference matters in the Bruin analysis. Um, additionally, briefly, uh, just addressing the government's arguments on the materiality and the false statement, I, I think government counsel may have accidentally misspoke. Our, our claim does not depend on the outcome of the G8 challenge, only the G5 challenge. Um, the statements related only to citizenship and immigration status. And I would make clear that I don't think Manny, this court's holding in Manny, uh, controls this court's, um, decision in this case at all. Manny was a straw purchaser case, um, and Abramski is clear that under section 922, it's required that the purchases be made in person by the true purchaser. So... But just to be clear, the materiality claims do rise and fall with G5. Yes. G8 doesn't have anything to do with it. Correct, Your Honor. Okay. Thank you. I just wanted to clarify that. Um, the, the change in the true purchaser requirement, you know, has not been challenged and was not challenged in Manny. Here, we are contending that G5 is unconstitutional on its face. As such, any statements pertaining to that ground, uh, would be material. Okay. Thank you, counsel. I believe this matter is submitted and we are adjourned for the day. All rise.
judges: McKEOWN, SUNG, Fitzwater